14- 1647-

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

JUN X 5 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA
*ex rel.* SHARLENE RICE,

    Plaintiff,

v.

EVERCARE HOSPICE, INC.,

    Defendant.

13CV4191
JUDGE HOLDERMAN
MAG. JUDGE COX

)
)
)
)
)
)
)
)

**FILED UNDER SEAL**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER** **FILED**

UNITED STATES DISTRICT COURT
DENVER, COLORADO

**DEMAND FOR JURY**

JUN 11 2014

JEFFREY P. COLWELL
CLERK

### *QUI TAM* COMPLAINT

Relator Sharlene Rice, on behalf of herself and the United States of America, alleges and

claims against Evercare Hospice, Inc., as follows:

### JURISDICTION AND VENUE

1.    This action arises under the·False Claims Act, 31 U.S.C. §§ 3729-33 (the "False

Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. ·

Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because

Defendants qualify to do business in the State of Illinois, transact substantial business in the State

of Illinois, transact substantial business in this judicial district, and can be found here.

Additionally, and as described herein, Defendants committed within this judicial district acts

proscribed by 31 U.S.C.    § 3729. Specifically, Defendant submitted and caused to be

submitted within this judicial district false claims for hospice care for ineligible patients and

made or used false records material to such claims

## PARTIES

3.      Defendant Evercare Hospice, Inc. ("EverCare") is a for-profit, Medicare-certified hospice provider with its principal place of business in Eden Prarie, Minnesota.  Evercare is owned and operated by OptumHealth Care Solutions, Inc., which is in turn owned and operated by UnitedHealth Group, Inc., (NYSE: UHG).  Doing business as Evercare Hospice and Palliative Care, Evercare offers Medicare and Medicaid-supported hospice services from 17 locations in 13 states, including the Chicago, Illinois area.

4.      Relator Sharlene Rice is a Registered Nurse ("R.N.") of seven years' experience. Ms. Rice was hired by Evercare as an R.N. "case manager" in April, 2012.  In the course of her duties, Ms. Rice quickly became aware that EverCare systematically enrolls, recertifies, and falsely bills the United States for hospice patients whose objective medical conditions belie a terminal diagnosis. Ms. Rice refused to participate in Defendant's fraud and was terminated in April, 2013.

5.      Through her experience, Relator has become convinced that the illicit practices described herein represent a systematic, fraudulent scheme endemic to Defendant.  Defendant's improper conduct offends Relator's long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes her to file this Complaint on behalf of herself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

6.      Prior to filing this Complaint, Relator voluntarily disclosed to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. § 3739(e)(4)(A), Relator is the original source of the information for purposes of that Section.   Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator

2

voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in her possession upon which her claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

.7.    Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8.    Through the Medicare Hospice Benefit ("Hospice"), Medicare pays for hospice care for certain terminally ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d. A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course." 42 C.F.R. § 418.3. In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment. *See* 42 U.S.C. § 1395d. A patient may at any time revoke his or her hospice election and resume Medicare Part A coverage. 42 C.F.R. § 418.28.

9.    Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical principles of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally-ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee

3

on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."  In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986.  By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10.     From such humble, altruistic roots, Hospice has become big business.  Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006.    In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population."  Venture capitalists and other investors have been quick to perceive that the Medicare Hospice Benefit represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

**II.      Hospice Benefits, Reimbursements, and Requirements**

11.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22.  Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.  Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

12.     Through Medicare and Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.   Medicare or Medicaid makes a daily payment, regardless of the amount or cost of services provided on a given day and even on days when no services are provided.   Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

13.     In return for the Hospice *per diem* payment, hospice providers are obligated to provide patients with all covered palliative services.   *See* 42 C.F.R. § 418.202.   The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56.   Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness. *Id.*; *see also* 42 C.F.R. § 418.108.

14.     Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y. Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y (a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.   Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

15.     Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff.  Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and

limitations on Hospice coverage.  Medicare will not pay for hospice care provided to a patient who does not meet the LCD for the patient's stated diagnosis. *See* 42 U.S.C. 1395y.

16.     To enroll as a Medicare providers, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A.  In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:.

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

17.     Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary (FI) or Medicare Administrative Contractor (MAC) responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450. Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

18.     Defendant thus certified that each claim for a hospice *per diem* payment represented a day of care provided to a terminally-ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification.  Defendant further certified that their programs were in compliance with Medicare regulations, including the requirement that Defendant provide short-term in patient care related to their patients' terminal conditions.

## DEFENDANT'S FRAUDULENT SCHEMES

19.     Evercare systematically defrauded the United States by billing Medicare and Medicaid for Hospice patients whom it knew were not terminally-ill.

20.     With the goal of fraudulently generating profits, Evercare billed the United States for patients whose objective medical conditions belied any terminal diagnosis. Evercare's clinical management systematically and fraudulently altered and manipulated clinical information upon which its physicians relied in certifying patients as terminally-ill. Additionally, Evercare's medical directors routinely signed certifications of terminal illness without reviewing any patient information and at the behest of Evercare managers who knew the patients did not qualify for Hospice.   Furthermore, Evercare's non-physician managers often simply over-rode physician judgment and coerced Evercare's physicians into certifying patients who they knew were not terminally-ill and did not qualify for the Medicare hospice benefit.

21.     Evercare Clinical Services Manager Merilee Smith ("Smith") made clear to clinical staff that every patient who was referred to Evercare was to be admitted, regardless of eligibility. As specifically described below, when patients' clinical characteristics were at odds with LCDs and hospice eligibility requirements, Smith instructed nurses to conceal those facts and to instead record false or misleading information indicating terminality. Very frequently, Smith herself altered patient information in order to obtain physician signatures on certifications of terminal illness ("CTIs").

22.     Relator frequently attended interdisciplinary group ("IDG") meetings at which Evercare's medical director Dr. Oommen Bino ("Dr. Bino") signed entire stacks of CTI's without reviewing any clinical information. On these occasions, Dr. Bino had not participated in patient discussions and could not have relied upon information conveyed orally by the nursing

staff.  Instead, he simply signed forms at the direction of Smith, exercising no clinical judgment whatsoever.  As specifically described below, many of these patients were not terminal.

23.    Medical Directors Dr. Karen Babos ("Dr. Babos") and Dr. Bino relied upon Smith or other nurses to compose the physician narratives required to support their CTIs. Smith – and, at Smith's instruction, other nurses – used false information in these narratives to create the fraudulent appearance of terminality, when in reality they knew the patients were stable or chronic and not terminal.  As a result, Evercare's CTIs were based on false information.

24.    On many occasions at IDG meetings, Dr. Babos and Dr. Bino expressed the opinion that Evercare patients were not terminally-ill and should be discharged.  Based not upon clinical judgment but solely upon the desire to maintain a high patient census, Smith frequently rejected these physician judgments and ruled that the patients should be re-certified.  Evercare's physicians often complied and recertified patients solely based on Smith's direction and not on clinical factors.

25.    The following are merely a representative example of the recent results of Defendant's fraudulent practices; the following patients have been fraudulently certified by Defendant as terminally-ill and falsely billed to the United States through CMS:

a.    Patient B.C. was admitted by Evercare on September 8, 2012 under diagnosis of unspecified debility, yet B.C. did not meet the LCD for that diagnosis and was not terminal. B.C.'s chart demonstrates that B.C. did not have a 10% unintentional weight loss in 6 months as required by the "debility" LCD, and in fact gained 20 pounds during the months of December, 2012 and January, 2013. B.C.'s body mass index ("BMI") upon admission was 41.1; B.C. was able to perform activities of daily living ("ADLs") and used cane-assistance to walk

over 100 feet daily; B.C.'s palliative performance score ("PPS") was 50%; B.C. had no significant co-morbidities that would affect prognosis.   All of these objective clinical factors are completely at odds with a terminal debility diagnosis. In fact, B.C. did not require hospice care and refused the vast majority of Evercare visits to B.C.'s home – he received no hospice aide, social worker, or chaplain services whatsoever.   At an IDG meeting on October 11, 2012, and at such meetings every two weeks thereafter, the group discussed B.C.'s evident improvement and patent ineligibility.   Evercare knew that B.C. was not terminally-ill and that it was billing the United States for care that was not being provided.   In December, 2012, B.C.'s family sent Smith an email informing her that B.C. was "eating regularly and [did not] need hospice care."   Nevertheless, Smith coerced B.C. into remaining on Hospice and Evercare falsely recertified B.C. as terminally-ill on December 17, 2012, despite no evidence documented of decline.   On February 23, 2013 B.C. was finally deemed to be ineligible and was discharged on March 1, 2013.   Evercare was aware that B.C. was ineligible for hospice services but falsely billed the United States for his care from September 18, 2012 to March 1, 2013.

(b)     Patient T.N. was admitted by Evercare on January 30, 2012 under a diagnosis of cardiac disease, unspecific.   T.N. did not meet LCD for diagnosis and was not terminal.   T.N.'s chart demonstrates that T.N did not show significant signs of congestive heart failure at rest such as edema; T.N. was not optimally treated with diuretics or vasodilators (as documented in T.N.'s chart upon recertification on July 28, 2012); T.N.'s chart contains no documentation

9

indicating an ejection fraction of less than 20% - all of which is required by LCDs and Medicare standards for terminal cardiac disease. T.N. documented and reported weekly outings to restaurants and daily participation in activities at T.N.'s assisted living facility.   Nevertheless, Evercare fraudulently recertified T.N. seven times – often over the objection of IDG members and the medical director.

(c)    Patient J.E. was admitted by Evercare on June 29, 2012 under a diagnosis of chronic obstructive pulmonary disease ("COPD"), yet J.E. did not meet the LCD for COPD and was not terminal. J.E.'s chart lacks any evidence of the required factors indicating end-stage lung disease, including: a predicted ejection fraction of less than 30%, disabling dyspnea at rest resulting in decreased functional activity, *cor pulmonale*, hypoxia at rest, or tachycardia at rest. In fact, J.E. lived alone and was able to perform ADLs.  It was known to Evercare that J.E. periodically left home for recreation and was even able to clean J.E.'s apartment. On November 14, 2012, the IDG discussed nursing notes documenting those facts.  J.E.'s chart shows (for example, on September 26, 2012) that J.E. improved functionally and gained weight while on Evercare's services. Nevertheless, Evercare recertified J.E. five times and is currently falsely billing the United States for Hospice care allegedly provided to J.E.

(d)    Evercare admitted patient M.J. to Hospice on March 12, 2012 under a diagnosis of heart disease. M.J did not meet the Medicare guidelines and LCDs for an end-stage heart disease diagnosis and was not terminally-ill. The documentation in M.J.'s chart shows that M.J. did not have congestive heart

failure with New York Heart Association class IV and signs and symptoms and did not have a prognosis of six months or less to live. In fact, M.J.'s chart showed on May 22, 2012 that M.J. could ambulate with a walker – revealing as false Evercare's assessment that M.J.'s PPS was 30%. On June 7, 2012, Evercare recertified M.J. as terminally-ill with no evidence that M.J.'s heart disease was terminal. Thereafter, Evercare repeatedly recertified M.J. – and falsely billed the United States for M.J.'s care – before finally discharging M.J. on November 5, 2012 for extended prognosis.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729

26. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

27. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b) Defendant submitted false claims for Hospice care provided to patients admitted under a false diagnosis and to whom Defendant did not provide complete palliative services under a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)    Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

28.    The United States paid the false claims described herein and summarized in Paragraph 27(a)-(c).

29.    Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

30.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE**
**CLAIM UNDER 31 U.S.C. § 3729**

31.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

32.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material

to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United

States, to wit:

(a)    Defendant created and used false certifications of terminal illness; false admission

paperwork indicating fraudulent diagnoses; false patient care plans not calculated to cope with

patients' actual needs and conditions; and other false records intended to support their fraudulent

billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations

cited *supra.*

(b)    Defendant made false certifications regarding past, present, or future compliance

with a prerequisite for payment or reimbursement by the United States through Medicare or

Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when

Defendant was aware that its practices as described herein were in violation of Medicare

payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

33.    The false records or statements described herein and summarized in paragraph

32(a)-(b) were material to the false claims submitted or caused to be submitted by Defendant to

the United States.

34.    In reliance upon Defendant's false statements and records, the United States paid

false claims submitted by Defendant that it would not have paid if not for those false statements

and records.

35.    Defendant's fraudulent actions described herein have resulted in damage to the

United States equal to the amount paid or reimbursed to Defendant by the United States for such

false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States,

and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT THREE**
**"REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)**

36.   Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

37.   By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  Defendant knew that it had received millions of dollars in Hospice *per diem* patients who did not qualify for Hospice, yet Defendant took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

38.   As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

14

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

Date: June 5, 2013.

*Henry Frohsin (RP)*

HENRY I FROHSIN
JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
CARRIE M. MOTES
Attorneys for Relator
Sharlene Rice

**OF COUNSEL:**
FROHSIN & BARGER, LLC
3430 Independence Drive, Suite 40
Birmingham, Alabama 35209
Tel:    205.933.4006
Fax:    205.933.4008

Nola J. Hitchcock Cross, Esq.
Katherine M. Gaumond, Esq.
CROSS LAW FIRM, S.C.
Lawyers' Building
845 N. 11th Street
Milwaukee, Wisconsin 53233
(414) 224-0000
njhc@crosslawfirm.com
kgaumond@crosslawfirm.com

**LOCAL COUNSEL:**
Robin Potter, Esq.
Shankar Ramamurthy, Esq.
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Street
Suite 2600
Chicago, Illinois 60601
(312) 861-1800
robin@potterlaw.org
shankar@potterlaw.org

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Relator's

**COMPLAINT** was filed *in camera and under seal* pursuant to the False Claims Act and was

served upon the following parties on June 5, 2013, by U.S. Mail or as indicated below:

Honorable Eric H. Holder Jr.
United States Attorney General
U.S. Department of Justice, P.O. Box 261
Ben Franklin Station
Washington, DC 20044

Linda A. Wawzenski, Esq.
Assistant U.S. Attorney and Deputy Chief
United States Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604
**via Delivery**

_____
Robin Potter